MEMORANDUM OF DECISION
On March 3, 1998, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Myra R. to her six children and of the fathers, both named Mark R.[2] to whom, at different times, Myra had been married. The children had been removed from the care of their mother, Myra, on April 7, 1995. She was living apart from her second husband with all of the children. There had been a long history of the family with DCF with referrals beginning in 1993 of inadequate supervision, feeding and chaotic and dangerous household conditions. Despite such referrals, the neglect petitions allege the same conditions as there were apparently no changes made by Myra. On April 7, 1995, Myra had left the two youngest children with an impaired caretaker who was unconscious when a Headstart teacher came to the household. The two children had not been fed and were in urine-soaked diapers. Some months later, on July 17, 1995, all six children were adjudicated neglected and were committed to the care of DCF. Their commitments have been extended twice since that date and all of the children have been in foster care since April, 1995.
After several extensions of the commitments of the children, on January 14, 1998, the court found that reasonable efforts to reunify Myra with the children were no longer required. (Holden, J). On April 22, 1998, both the fathers consented to the termination of their parental rights to these children. The court CT Page 14610 found that the parents voluntarily and knowingly consented to the termination of their rights, having received the advice and assistance of competent legal counsel and having understood the consequences of their actions. Their consents were accepted by the court. (Holden, J).
The termination petitions allege that the children had previously been adjudicated neglected and that Myra had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the children, she could assume a responsible position in the life of the children. Connecticut General Statutes § 17a-112(c)(3)(B). The second ground alleges is that the children have been denied, by reason of an act of parental commission or omission, the care, guidance or control necessary for their physical, educational, or emotional well-being. Connecticut General Statutes § 17a-112(c)(3)(C). On September 11, 1998, DCF filed a motion to amend the petitions to state that reasonable efforts were no longer required due to Judge Holden's finding on January 14, 1998, that such efforts were no longer appropriate. The court granted the amendments at the start of trial. The court also took judicial notice of the prior neglect proceedings.
The court heard from many witnesses, including the mother, Myra R., during the three days of trial which ended on October 5, 1998. Those witnesses included Tina R., the foster parent of Mark, Michael and Amanda; Marjorie E., Jessica's foster mother; Michelle S., the foster mother for Sean and Amanda from January, 1998 to September, 1998; Kathleen G., the foster mother for Matthew. Two DCF social workers, Edward Batitista and Gary Saam, testified as well as several service providers. Sixteen exhibits were admitted. Simultaneous briefs were filed by all counsel on November 9, 1998, at which time the trial concluded. The court finds the following facts from the evidence:
 1. FACTS 1. The Home Situation prior to the Removal of the Children
Myra, herself, is the only child of her parents, who were divorced when she was very young. She has several half-siblings and was raised by her mother and step-father. Her formal education ended with the completion of the tenth grade and she secured her high school equivalency diploma some years later. She CT Page 14611 has had employment at a factory for a number of years since the removal of her children, but was not employed while they were in her care. Of her family of origin, she describes her mother as alcoholic and who did nothing around the house. She believes herself to have been emotionally abused by her mother and step-father. She ran away from home and began, at age fourteen, to live on her own with financial support from her father. When she was sixteen, she gave birth to her first child, who died of Sudden Infant Death Syndrome when six weeks old. Two years later, she met her first husband and they were married in 1984, when Mark was born. Three years later, their second son, Matthew was born. By 1989, Myra and Mark R. separated and subsequently divorced. In 1990, Myra married her second husband, who is the acknowledged father of the three youngest children, Jessica, Michael and Sean. At the time of the first DCF referrals in 1993, there were five children in the home, Myra's husband was only sporadically in the home and Myra was coping, as best she was able, with the children alone. Between the time of the first referral and the removal of the children in April, 1995, there were a total of seven referrals concerning the family, which reflected a family and a household that was out of control, a mother who was overwhelmed and children who were without adequate supervision, adequate feeding and adequate physical care.
The first anonymous referral was received in March, 1993, and after investigation, DCF confirmed that Myra hit her children with a belt and also that the children were locked in their rooms by their father for long periods of time as punishment. Three months later, in June 1993, a second referral from three different people noted that Myra left her children alone frequently, in a parked car while shopping, and fed them erratically. Further DCF investigation disclosed that the children were sleeping on soiled mattresses, were continuing to be locked in their rooms and only fed two meals a day, one very late in the evening.
A year later, in September, 1994, DCF learned from a hospital worker, that while Myra had left the apartment and the children were unsupervised, Michael had held Sean underwater in the bathtub until Sean, the younger child turned blue and required hospital care. Later that same month, Myra called to report that Michael had set fire to a waste basket in the home. At that time, the family was referred to the parent-aide program and services for the youngest children in the home were also provided. In the middle of the winter, on February 20, 1995, a caller informed DCF CT Page 14612 that Jessica and Michael were outside unsupervised after dark until seven in the evening. The following month, DFC learned that Michael and Jessica were seen walking on the street alone and unsupervised daily until around three in the afternoon. Myra admitted she permitted Jessica, then age six and Michael, then age four and a half, to walk to the convenience store by themselves.
Michelle S. testified that she worked with the family in January, 1995, as a "Birth to Three" teacher with services specifically directed toward Sean, who was then two. She stated that day care for the child was also provided by DCF as well as transportation. She testified that Myra allowed her as well as the parent aide to work in the home, but that Myra herself "did not participate a lot." Mainly, Michelle S. stated, Myra sat at the kitchen table, smoked cigarettes and drank from her can of soda. On several occasions. Michelle S. was present when the older children came home from school. She noted that Mark, the oldest, acted in a parentified fashion, providing care for his siblings. He made peanut butter and jelly sandwiches for the others and asked his mother "did the baby need to be fed or changed" and reminded her of the school schedule and events which were to take place there. Michelle S. testified that when she was in the home in 1995, the household was always chaotic, there was a pervasive odor of soiled cat litter, dishes and bottles in various states of use. She said the children's beds were bare mattresses on the floor and that Sean's crib was losing pieces from the headboard, because of his persistent head butting. In the four months that she provided services, the situation changed little, sometimes becoming neater and cleaner when the parent aide had come, and then gradually degenerating again into chaos. She did not see any progress on Myra's part and noted that during her time there, Myra's youngest child, Amanda, was born. The youngest was always in her infant seat when Michelle came on her weekly visits to work with Sean.
On April 7, 1995, around eight in the morning, Myra left Sean and Amanda with an impaired caretaker, who was found unconscious when the Headstart teacher and a policeman came to the home. The children appeared hungry and were in urine-soaked diapers. The home was filthy, cluttered and not fit for all six children. DCF removed the youngest from the home, the other children from school and placed them in foster care. None of the children have returned home since that time. CT Page 14613
2. Efforts made by Myra R. since the Removal of the Children.
After the removal of the children, Myra began to become involved with the various services to which DCF referred her. Gary Saam, the DCF treatment social worker, testified that the issues i, n the case were Myra's ability to provide a safe and nurturing home for the children and to meet the needs of all the children. While some of the pre-removal reports and reports by Myra's former and present husband to DCF had mentioned drug and alcohol abuse by Myra, this was never substantiated and there was no evidence of such abuse. There were urine screens and drug abuse evaluations, in which Myra participated. She also attended a parenting program at Naugatuck Youth Services, which consisted of lectures and group sessions. This was not the program to which DCF had intended to refer her. The agency did provide a more intensive program, to which Myra was never successfully referred.[3] Myra also attended individual counseling with the Morris Foundation, where she received counseling from Alice Griffin, who testified at trial. Ms. Griffin provide counseling from December of 1995 to early 1996 to Myra. The counseling then ended because Myra was in parenting classes and the schedules of the programs conflicted. The plan, as articulated by DCF and the Morris Foundation, was that Myra would return and continue her counseling. She had six sessions there and never returned. Ms. Griffin reported concerning her assessment of Myra's ability to provide care for her children. She stated that it appeared that while Myra:
 "knew what the actual functions were to provide for them, it was not clear she was able to perform the functions she could describe. While she would describe her interaction with the children, it was always by the book and there were never any descriptions of the children's responses, . . . what they were actually doing as opposed to what they should be doing".
She stated that she noted considerable evidence of depression in Myra.
Robert Erwin, a clinical social worker, testified that he had counseling sessions with Myra from October of 1996 to January of 1997, when she canceled the appointment due to medical problems with her back. He stated that Myra was not highly motivated to be there and concluded that while she had some understanding of why her children were removed from her care, she minimized her own responsibility. He stated that additional counseling and therapy CT Page 14614 would have been helpful to Myra. Myra did not seek any further counseling and therapy even when it was regularly suggested by DCF.
3. Psychological Evaluations
One additional concern DCF had was whether or not Myra had any psychiatric conditions. Myra claims that DFC had an obligation to secure a psychiatric referral for her. Nonetheless, Myra was seen for a court-ordered family psychological evaluation by Sidney Horowitz and for a court-ordered individual psychological evaluation by Anthony P. Compagna. Dr. Compagna testified that he did not see any need to refer Myra for a psychiatric review or medication. Had he seen such indications in his evaluation of her, he testified, he certainly would have referred her to such services, as he does for other patients he sees. In his evaluation, he found that MYRA had areas of specific intellectual and emotional vulnerability. He reported that "Myra's efforts to cope with the demands of independent living and child rearing are likely to be compromised by specific skill deficits resulting from her own disrupted academic preparation."[4] He testified that he found in Myra an emotional vulnerability and delays in development which did not rise to the level of a diagnosable disorder, but that could be addressed in long term therapy. In his report, he found that her early history of a disrupted family life and parent-child relationships when she was precipitously forced out of a developmentally appropriate adolescent role into assuming precocious autonomy for which she was emotionally unprepared" could be linked to her current difficulties.[5] He testified that she required individual therapy and any meaningful changes on her part would require at least a year to a year and one half, if not longer, of such therapy.
Sidney S. Horowitz, who performed psychological evaluations of the mother as well fathers and the children saw more serious issues with the family and with Myra. In describing the rambunctiousness of the children, he testified that the sessions with the parents and the children, when he saw them in 1996 for the first time, were the most chaotic interactions he had seen in his professional career as a clinical psychologist over twenty years. He said that the children were acting like "bumper cars," bumping into each other and that there was no limit setting by the parents. He stated that he was deeply troubled on a professional level by the interactions of the younger children, CT Page 14615 (who) wandered aimlessly during the interviews." He noted that the children were "fragile and that each presents with their own needs — seizure disorders, cognitive limitations and attachment difficulties." He observed that the parents had a less than adequate understanding of the children's developmental needs.
At an update of his evaluation in April, 1997, he again saw the children and their parents.
He stated in the report he prepared that:
 "The parents appear almost unaware of the heightened needs of these children when they are together as a group. It is frightening to this evaluator to think what it would be like if the children were to reside with any of these parents at this time without a "life guard" on duty at all times. I fear that these children would be at serious risk of harm.[6]
He testified that he had to intercede during the parent-child interactions for the children's safety and well-being.
Despite their chaotic interactions while in the presence of the parents, Dr. Horowitz stated that when he saw the children during two separate evaluations a year apart, the children were able to focus and act appropriately, respecting each other's needs and space, when their parents were not present. Gary Saam, the DCF social worker, reported observing the same pattern with the children while they were with their foster parents. He noted they were generally well-behaved and the same out-of control behavior they exhibited when with their mother did not take place.
Dr. Horowitz concluded in 1996 that the six children were the products of a "very dysfunctional family environment where the adults appear to have very questionable abilities in being able to provide, structure, safety, nurturance and support for them."[7] In his initial assessment, he found that Myra R. appeared to have difficulty in social judgment. Her personality testing results indicate an individual who is hostile, depressed, aggressive and at times suspicious . . . . The history of interpersonal relationships (of such people) are chronically poor due to the open expression of hostility and anger." Other tests used supported these results.
In the parent-child session, Dr. Horowitz observed that Myra CT Page 14616 did not respond to much of what her children were doing, including Jessica's periodic tantrums and screaming. He concluded that "The level of chaos and disorganization in an environment that has little extra stimulation only heightened this examiner's sense of what it must be like when there are other sources of stimulation going on and the containment is not as rigid."[8]
At that time, Dr. Horowitz cautiously recommended increased visitation and "developmental teaching" to see if greater reunification could occur.
4. Visitation and Services
While visitation did return to once-a-week in the fall of 1996 after this evaluation, there was no provision of "developmental teaching" of parenting skills to Myra. Myra claims that DCF failed to provide her with the types of hands-on parenting education services she required and therefore failed to make reasonable efforts to reunify her with her children. In such programs, during supervised visitation, a parent educator observes the sessions and provided feedback to the parent concerning parenting techniques and interventions which might prove effective. Often, there is an additional and intensive group classroom component to such programs, where parents can discuss what they have observed and learned and consider other methods of dealing with their children.
While the court has no doubt that such programs are beneficial to parents who require assistance, the DCF worker testified that none were available in the service area where Myra resided until this past year. While it is the case that DCF must make reasonable reunification efforts and provide services, as has previously been found, DCF is not required to provide all possible services. In re Eden F, 48 Conn. App. 290, 710 A.2d 771
(1998), cert. grt, 245 Conn. 917, 669 A.2d 636 (1998).
The court is also mindful of the fact that Myra received in-home services when the children were in her care in 1994 and 1995, with a parent-aide to help her and with the "Birth to Three" assistance as well as Headstart for her younger children. During this period of time, she appears not to have benefited at all by direct instruction and did not participate. She was able to tell the service providers and DCF that she would not leave her children unsupervised again and then leave them unsupervised. These were, the court understands, services prior to removal to prevent such removal. But they reflect Myra's initiative, CT Page 14617 willingness and motivation to participate and benefits from services in the past that have also noted by the more recent service providers since the children were removed.
Both counselors who provided individual therapy to Myra spoke of her lack of involvement and commitment. Myra, unfortunately, did not then and has not since her children's removal, demonstrated any initiative or commitment to make the significant internal changes necessary to enable her to better parent her children. She did not seek out and continue with parenting education after her initial course. She has also failed to complete any meaningful individual counseling.
Since 1995, Myra has had consistent, frequent visitation with her children. With the exception of scheduling mix-ups not of her doing and her back surgery in 1996, Myra has not missed any visits. She, by all reports, is committed to seeing her children and loves her children. Initially, the visitation was supervised every week for one hour at the DCF offices. Then, when DCF experienced difficulties in transporting the children from their various foster homes to visitation in 1996, it was changed to every other week. In early 1997, visitation was again once a week with a smaller divided group and then all six children together. Both social workers described the supervised visits as energetic and chaotic. Gary Saam, who has been involved with the family since October, 1996, to the present, reported that the majority of the visits were aloud and rambunctious" and that there were "a lot of times when (Myra) would not move or act in an appropriate fashion to stave off a possible incident." He stated that the children were "wild" during visits. He described as an example a visit which took place in the park when Jessica was doing antics on a park bench and when she stepped in a pail and fell down. The other children were using sticks and engaging in swordplay. He had to do preventive maintenance, either telling the children to behave or reminding Myra to take some action. Mr. Saam also described the problems which occurred when Myra promised her children things at the visits and was not able to deliver on those promises. Myra used the promise of snacks and the withholding of such snacks to try to secure the children's good behavior and to get them to be willing to come to visitation. Often, Mr. Saam stated, he would himself buy snacks before visits to make sure there was enough food for everyone.
Such visitation sessions, while artificial in some sense and unlike the home environment, do provide structured and controlled CT Page 14618 opportunities to demonstrate and exercise parenting skills. Unfortunately for Myra and the children, those sessions dramatically demonstrated that she was never able to exercise an even moderate level of control or organization on behalf of her children.
The court heard Myra's own testimony and, despite her claims to have learned and understood child rearing techniques, it was apparent how little she actually did comprehend about the complex interactions between parents and children and a large number of siblings and their own internal relationships within the group they formed. She admitted that if the older children were happy in their placements, then perhaps they should remain were they were. She did believe that she could parent a smaller number of children and in particular, the two youngest, Sean and Amanda. She complained that she had never been given the opportunity to do so and reunification with them had never been attempted.
As has been noted, "it is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct." Dadio v. Dadio, 123 Conn. 88, 92,192 a.2d 557 (1937). And the court concludes, based on the testimony, that Myra has not begun to make the required personal changes which would permit her, even with the "developmental teaching" Dr. Horowitz recommended which she admittedly did not receive, to parent her children. It would take, given both the number of children involved and their varied and specialized needs, considerable and well-developed parenting skills to parent these children, all of whom are needy children. From the evidence, the court concludes that Myra did not possess more than rudimentary parenting skills and that, given the level of individual counseling still required for her to make personal progress and her demonstrated lack of such progress over the past three and one half years, she could not acquire it within a reasonable time for the needs of her children.
5. The Six Children
Each of the children has had and now has different issues, problems and needs and several of the children have highly specialized needs. Despite their myriad differences, one recurring theme appears with all of these children, a preoccupation with food and its availability to them. From the evidence, which will be reviewed, the court concludes that Myra CT Page 14619 did not adequately and reliably provide sustenance to her children and that her failure to satisfy this basic need has emotionally scarred them all. To this day, years later, despite the plenitude of food available to the children each of them continues to exhibit behaviors reflecting a scarcity of food and persistent fears about their own security and survival.
A. Mark, Michael and Amanda
These three children now reside in one foster home together. Their present foster mother testified eloquently to the difficulties and family adjustments that have been made, for the sake of the considerable and differing needs of these children. The first child to arrive, Tina R. testified, was Michael, who was placed with her after he was removed from his mother's home in April, 1995. When he arrived, she testified, he emitted a pervasive odor of urine which, despite repeated washing, did not fade for about a month. She said his scalp and his hair in particular gave off this odor and when he first was in the home, the odor was so strong, it was difficult to go near him. She also testified that Michael, when he first arrived, had an extraordinarily distended stomach and ate ravenously. For his first breakfast, she testified he ate fifteen pancakes. He continued over the course of time to be impulsive about food, grabbing it off the table, even almost off the stove top. She stated she continually had to reassure him that there would be enough food and that "it was ok, he would receive enough food." She said that she began to show him affection, to hug and kiss him. Once, he responded by telling her that he did not remember ever being kissed before or hugged — adding that his mother had kissed him "probably as a baby."
When Michael first came into foster care, he was suffering some significant delays in visual motor integration skills and there was a high likelihood of Attention Deficit Disorder, according to this child's evaluation by Dr. Horowitz. Michael reported to Dr. Horowitz that his mother had hit him with a belt. Dr. Horowitz had previously assessed Michael in 1994, after the fire-setting incident and his near-drowning of his younger brother, Sean. He noted in 1996 that Michael was several years behind normal developmental levels and showed impulsivity and distractibility. Tina R., his foster mother, testified to the enormous strides Michael has taken. While in her family, he received speech therapy, occupational and psychological therapy. He has some tremors and cannot, for example, see spacing between CT Page 14620 letters. She stated that his speech has improved and he has gone from being an "angry and explosive, disruptive and impulsive child to being a pleasure to have in his class, he is a hard worker and sympathetic, the first child to comfort another child — and loving at home. He is an excellent swimmer," she said, and excels in this sport. She stated with pride in her voice "he is a very special child, who has come a long way."
The next child to be taken into her family was Mark. He came to stay permanently in late 1996. Mark, the oldest child, was originally placed with another family in her town and visited her home during sibling visits. She also provided respite care for the other foster family and so came to know Mark, Matthew and Jessica. Mark also became a friend of her biological daughter, who is close to Mark's age. Mark would come quite often and stay overnight, going on trips to the museum and other outings with them. When the foster home in which he had been placed could no longer keep him, he asked to move in with Michael's foster family. The first night he stayed after the move from his previous foster home was traumatic. Mark had a screaming episode about the precise bedtime and finally ran down the stairs, going to the basement and crawling into a corner under a leak. When the foster mother was trying to comfort him, he told her that this is where I belong, I used to sleep in a basement like this and I was hungry."
Mark, too, showed a preoccupation with adequate amounts of food to eat. He confessed to Tina that at times when with his mother, he stole food from the store, hiding cheese under his shirt and lying. Mark stated he was so embarrassed about this. When planning a birthday party for him some time later, Tina said he asked for a hunk of cheddar cheese, that it should be placed on a shelf with his name on it, so that when he wanted it, he could eat it anytime.
Mark also had other problematic behaviors. He would bury his head in the pillow every night and hold his breath until he turned red and then he began to throw up. He told her when he was home, he would often cry at night and that there was a boy who lived in the apartment below who heard this and made fun of him at school. Tina also testified that Mark would rock back and forth and cry. When she comforted him and told him that he needed to talk to someone to help him, Mark told her that he did not want to talk to anyone, that there were things in his life that were so horrible that "I do not ever want to tell anyone until CT Page 14621 the day I die." But he is receiving counseling, and although he had not opened up fully, Mark's behaviors have abated, his fears and concerns quieted somewhat. She stated that he has settled in with the other members of the family. Mark, his foster mother testified, is doing very well academically. He is now fourteen and dealing with various adolescent issues, enjoys school sports and is active in the church they attend.
Mark, his foster mother testified, had a difficult time visiting with his mother last year. He did not want to visit at times. Then his mother promised him a Nintendo game. He came to visit after visit, hoping for the gift. After a while, Myra told him it would come in the mail. Mark went to the mail box day after day, looking for the gift, only to be disappointed regularly. Finally, the game did arrive, but the damage in terms of his long unfulfilled expectations was done.
The last child to come to this home was the youngest child, Amanda. She had been with Tina's family for a month at the time of trial. Michael has been extraordinarily loving with his sister, helping her to adjust to her new family. Amanda suffers from asthma and has some difficulty with eye-hand coordination. She receives physical therapy. Tina said the child is seen by a pediatric cardiologist and also by a pediatric orthopedist for her hip as she walks with her hip thrust forward. Her medical problems will require attention for years to come. Amanda is now four years old.
Amanda, like her brother Sean, has been in six different placements. The last placement lasted for about a year. Michele S., the Birth-to-Three teacher who had been in Myra's home in 1995, heard in 1997 that there were problems in the children's fourth placement and fifth placements. When these children came to her home from January until September, 1998, they exhibited some severe problems. Amanda would not urinate or have bowel movements for up to three days. She would cry and cream and talk to herself for hours and was inconsolable. During the nine months they were with her, she stated that Amanda never stopped having sleep issues. She hoarded food and toys and after she left Michele found things in the child's room. Amanda tore most of the wall paper off the wall in her room, she wrote on the furniture and in general had great difficulty in knowing what the limits were. She testified that Amanda was extremely needy for affection, she always wanted to be held as did Sean. Neither of the children were particular as to who held them. She said each CT Page 14622 of them in their bid for attention would often push themselves between her and her biological son. She stated that when the two children began to act out sexually, she felt she could not longer keep them in her family. Amanda then went to live with Michael and Mark and their foster family, where she is doing well, although it is too soon to know about any adjustment difficulties she may have as she begins to settle into this home.
B. Matthew
Matthew, who is now eleven and the second oldest child of his family, was, after an initial placement, placed in the foster home with Mark and Jessica. In August 1997, when that placement was disrupted, he was placed in a foster home with Kathleen G., who had come to know him when she was an aide in the special education classroom in which Matthew had been placed. Matthew, when evaluated by Dr. Horowitz, was noted to have a history of Attention Deficit Hyperactivity Disorder and a seizure disorder, and has moderately impaired visual motor tracking skills. Because he is easily confused, he has heightened inattention and distractibility, which interfered with his academic functioning. Dr. Horowitz notes that Matthew feels "so very different because he resides away from his parents . . . He carried a number of powerful emotions about being loved or in fact being lovable with numerous concerns about where he will reside and who will take care of him."[9] Unfortunately for Matthew, his placements were disrupted after this evaluation in September, 1996 and these concerns remain very real to him. He is fortunate that a concerned teacher's aide came to know him and took action to become his foster parent and to preserve his sense of continuity, both to his school and to his siblings.
When Kathleen G. first came to know Matthew in the classroom, he was about two years behind his age group, he did not like to read, but she stated that he "was a good kid and followed the rules most of the time." When Kathleen learned Matthew had been removed from his foster home, she went to visit him at the State Receiving Home and then went through the process of foster home training. Matthew visited with them in their home as part of the pre-placement process. When Matthew first came to her, she stated he was "angry and confused." Now, she stated that he no longer has any trust for his mother and is happy where he is and would like to stay." He has grown up a lot, is doing well in school and is emotionally holding his own. "He is not afraid of his own feelings," she concluded, "although it is likely that he will CT Page 14623 always require special education." She stated that he enjoys seeing his brother and sisters during the visitation sessions. He misses his siblings, but he is often upset after visits with his mother. She stated she has observed that promises are often made to him, which are not kept. Apparently a Nintendo game was promised to him as well as Mark and that he went to visits for a number of times, anticipating this gift and has never received it.
Matthew had described the living situation in his home with Myra, reporting that he was locked in a room, that often the children had to cook and clean for themselves and take care of the little ones. He is disappointed, she stated, that things have not gotten better and sometimes he is angry about it. He has had nightmares about his mother coming to take him away. Kathleen G. described a visit in which he reported that he told his mother he was going on to the fifth grade. His mother replied that he was not smart enough and that he would be staying in the fourth grade. Matthew was upset and when the time came to go up to the fifth grade, he needed reassurance that what his mother had told him was not true. Matthew, like his siblings, has persistent concerns about food. He often asks for a second helping and talks about not being able to have extra food. He also wonders about being able to have lunch.
C. Jessica
Jessica has had as hard a time as her other siblings, but her situation is made more difficult by the fact that she is a bi-racial child and that the others regularly teased her about it. Myra's second husband has acknowledged paternity of Jessica, so there remain no legal issues concerning her. Myra reported that Jessica is the product of rape and that the circumstances of her conception were traumatic for her. After Jessica's placement in the home with Mark and Matthew ended, she came to live with Marjorie E., in November of 1996. She is the only child in this household, but Mrs. E has a large extended family, all of whom have come to love this child.
Initially, Marjorie reported that there were some issues with Jessica, she acted as if she were starving to death and was always hungry. Several months prior to this placement when Jessica was evaluated by Dr. Horowitz, he noted that what "is quite clear is that she is an angry and anxious child with a number of depressive themes that come through the testing." Now, CT Page 14624 she is less anxious, her foster mother reports. She also had some tantrums in the beginning, but those have abated. Jessica has been receiving therapy at the Child Behavioral Clinic and she has seen a change in her. She has become the average mischievous nine year old and does well in school.
D. Sean
Sean was originally placed in foster care together with Amanda. Together, these children had five different placements, which could only have served to exacerbate the emotional and other difficulties they experienced in their home with Myra. When evaluated by Dr. Horowitz in 1996, when he was only three, Dr. Horowitz noted some observable delays with Sean. Now, the DCF worker, Gary Saam testified, Sean is in kindergarten, but functions at the level of a three-year old academically. There are concerns that he suffers from borderline mental retardation. He has been in his sixth foster home since September 18, 1998 and appears to be adjusting well there. He has indicated he wishes to remain there.
 REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e) as to Myra R.:
1) Appropriate and timely services were provided by DCF, including counseling, parenting education, evaluations, transportation assistance, visitation coordination and case work services. While better coordination of the referrals might have resulted in Myra's attendance at the parenting program it was intended she attend, in general she was referred to such services as would be of assistance to her. And in particular, she did not continue with her individual counseling to help her to address many of the long standing and serious issues noted by both Dr., Compagne and Dr. Horowitz. It was only during the trial that she began to participate in an out patient mental health program and was apparently receiving medication for her condition.
2) The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. As of January 17, 1997, those efforts were not longer required by court order, but DCF continued with visitation sessions. The court further notes, that while intensive parenting programs with hands-on CT Page 14625 training while visiting with the children might have been of use to Myra, none were offered as none were then available. DCF is required to make reasonable efforts, not all possible efforts which could be of benefit to a parent. The court concludes that DCF met its mandate in this case.
3) DCF, with the approval of the Court, set reasonable and realistic expectations and service agreements in order to reunify the family. Myra was not able to fully comply with them, in particular as to individual counseling.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the child has developed significant emotional ties. Mark, Matthew, Michael and Jessica have strong emotional ties with the foster families who have provided the physical, emotional and educational support these children require. They know their mother and have had a connection to her, but none wish to be returned to her or to live with her. Their memories of their time with her while in her care are predominately negative. Amanda and Sean have not been in their present placements for a long enough period of time to know what their ties will be. Nonetheless, neither child has expressed a desire to return home, according to the DCF social worker, despite their many disrupted placements.
5) Finding regarding the ages of the children. Mark is fourteen, Matthew is eleven, Jessica is nine, Michael is eight, Sean is six and Amanda is four years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (a) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. while Myra has tried to adjust her circumstances so that the children may be returned to her, even if she were committed to the individual counseling she requires, it would be more than a year before any of the children could be returned to her, under the most optimistic of circumstances. Given the length CT Page 14626 of time they have been in care as well their own wishes, such a length of time is not feasible for them.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with he child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps to encourage Myra to have a meaningful relationship with her children and to rehabilitate herself, which she has been unable to accomplish.
 ADJUDICATION
The court further finds, by clear and convincing evidence, that as of February 2, 1998, Myra R. had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her children, she could assume a responsible position in their lives. Connecticut General Statutes § 17a-112(c)(3)(B). She has not comprehended the full extent of the parenting failures which led to the removal of her children. Her inability to parent them today is still apparent, as she does not understand their needs, how even to manage them in a supervised setting and provide the required structure for them. Instead, her presence and the memory of the parenting the children received while in her care causes the children to behave like "bumper cars," and randomly collide with each other and have no meaningful connection to their mother or each other during such time. Even under the best of circumstances, she requires at least a year of individual therapy to help her address her problems, if she were motivated to change and engage in the therapy, something she has; , never done in the more than three years the children have been in placement. These children cannot wait until some future and indeterminate time for the rehabilitation of their mother, a rehabilitation she has never taken required steps to achieve.
"`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. In re Migdalia M. 6 Conn. App. 194, 203,504 A.2d 532 (1986). See also: In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984). There is no doubt that Myra will not be rehabilitated within the foreseeable future. The court finds, based on the clear and convincing evidence, this ground had CT Page 14627 existed for longer than one year prior to the filing of the termination petitions.
The court finds, by clear and convincing evidence, that as of February 23, 1998, based on Myra's failure to adequately feed and nurture her children while in her care, her failure to protect them from physical abuse and her inability to provide adequate parenting that all of them have been denied, by reason of acts of parental omission as well as commission, the care, guidance or control necessary for their physical, educational, moral and emotional well being as set forth in Connecticut General Statutes § 17a-112(c)(3)(C). The children's preoccupation with food reflects that Myra did not adequately and reliably provide sustenance to her children and that her failure to satisfy this basic need has seriously emotionally scarred them all. There was evidence of physical abuse in the home, which Myra did not prevent. The children's fear of reprisals, and Myra's use of gifts and food in the supervised visitation context reflect an unawareness of and lack of sensitivity to their needs. The full and ongoing extent of the permanent emotional harm inflicted on these vulnerable children by her behavior cannot be denied. In Re Kelly S., 29 Conn. App. 600, 614, 616 A.2d 1161 (1992), In Re Sean H., 24 Conn. App. 135, 144-145, 586 A.2d 1171 (1991). The court further finds such circumstances had existed for an extended period of time in excess of one year prior to the date of the filing of the petitions for termination of parental rights.
 DISPOSITION
These children have all been in foster care over three years. Mark and Michael have had stability and consistency, which have been provided by their foster family and the stable home into which they have been welcomed. It is to be hoped that Amanda will flourish there, as well. Jessica and Matthew have done well in the homes in which they have each been placed. They have begun to recover and grow in those placements. Sean, too, appears to be settling into his new placement well. The court finds, based on the clear and convincing evidence, that it is in the best interests of both children to terminate their mother's rights to them. These findings are made after considering the special needs of these children and their demonstrated need for a secure and permanent environment. The court acknowledges the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD), 189 Conn. 276, CT Page 14628455 A.2d 1313 (1983). The Appellate Court has noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . . In re Alexander v.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD
99 (1979).
Based upon the foregoing findings, the court orders that a termination of parental rights enter with respect to Myra R. as to Mark, Matthew, Jessica, Michael, Sean and Amanda. The Commissioner of the Department of Children and Families is hereby appointed their statutory parent. If the present foster parents continue to be willing to adopt the children, the court directs that they receive first consideration. The court further orders that a permanency plan for all the children be submitted within ninety days. A review plan for them shall be filed in accordance with state and federal law.
Barbara M. Quinn, Judge Child Protection Session
[2] The fathers have different last names, although their names begin with the same initial.
[3] Given the many impediments that parents like Myra have, DCF should be alert not only to the need to make detailed and specific referrals, but to determine whether or not parents have accessed those services. In this case, a second referral some months after completion of the more general course of parenting training by Myra would have been appropriate and if made, should also have been reviewed to make certain that Myra attended.
[4] Petitioner's Exhibit 6, Psychological Evaluation, Anthony P. Compagna, dated May 20, 1997.
[5] Petitioner's Exhibit 6.
[6] Petitioner's Exhibit 5, Report of Sidney S. Horowitz, Ph.D., dated May 20, 1997.
[7] Petitioner's Exhibit 4, Report of Sidney S. Horowitz, Ph.D., dated September 10, 1996.
[8] Exhibit 4, page 6.
CT Page 14629
[9] Petitioner's Exhibit 4, page 13.